15 N.J. Super. 381 (1951)
83 A.2d 460
ETHEL HOLLY, PLAINTIFF-APPELLANT,
v.
MEYERS HOTEL AND TAVERN, INC., A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 10, 1951.
Decided September 26, 1951.
*384 Before Judges McGEEHAN, JAYNE, and Wm. J. BRENNAN, JR.
Mr. John A. Laird argued the cause for appellant (Mr. Nathan Cholodenko, attorney).
Mr. Andrew Lawrie argued the cause for respondent.
The opinion of the court was delivered by JAYNE, J.A.D.
The law applicable to the responsibilities of innkeepers is of ancient origin. The most industrious and *385 inquisitive research would probably fail to reveal when and where the first inn as such was established. The historian Herodotus awards the honor of establishing the first hotel to the Lydians. The Scriptures indicate that inns existed in Palestine and its adjoining countries. We read of the presence of "Khans" along the highways and "caravansaries" in the cities throughout Oriental countries. Perhaps nowhere in Europe did they more rapidly obtain an encampment than in England. Since the word "inn" is doubtless of Chaldaic origin, literally meaning "to pitch a tent," it may be said that the development and maintenance of inns have gradually expanded from the humble tents of the nomads of the desert to the magnificent structures of the 20th Century which in some instances seem to shelter a small village beneath a single roof.
Yet in the main the basic principles of law relating to the innkeeper's liabilities have continued to subsist. And so it may be remarked that the keepers of the enormous hotels in the great cities and recreational resorts of the United States of the present day derive their rights and trace their responsibilities to the host of the humble village inn of medieval England. More adventurous than circumspect would be the court that endeavored to innovate in the fundamental characteristics of so serviceable a branch of the law.
A phase of an innkeeper's responsibility is presented to us for consideration by the instant appeal. While the occurrence which induced this litigation is exceptional, it is not novel. This is a case of defenestration.
Since the trial judge granted a motion for the involuntary dismissal of the cause of action at the conclusion of the plaintiff's case, our summary of the testimony is stated in its aspect most favorable to the plaintiff's alleged claim.
It is acknowledged that the defendant was in control of the management of the 66-room hotel in Hoboken at the time of the mishap and thus occupied the legal status of an innkeeper.
On the afternoon of March 31, 1949, the captain of a ship engaged three rooms at the hotel for the accommodation of a *386 group of five Canadian sailors. The rooms so assigned were situate on the third floor, and evidently one of the rooms faced on Hudson Street. The chronological sequence of events is significant.
At 7 o'clock in the evening the sailors arrived at the hotel and proceeded to their rooms. Between 9:30 and 10 o'clock they communicated with the hotel clerk concerning the purchase of a bottle of rum. It was not supplied to them by the hotel.
At about 10:45 P.M. a female guest occupying a room on the third floor telephoned to the hotel clerk and imparted to him the information that the sailors were causing an unusual amount of noise. The clerk notified the sailors by telephone of the complaint and the sailors assured him that "they would be quiet." About 20 minutes later the same guest again communicated with the clerk and apprised him that "the noise had not subsided and they (the sailors) were throwing around what sounded like a shoe." Thereupon, at about 11:05 P.M., the hotel clerk personally announced his presence at the entrance of the room occupied by the sailors and again requested them to be quiet, asserting that otherwise they would be ejected from the premises.
Approximately two hours later the plaintiff was walking with her escort on the sidewalk alongside the hotel when a Coca Cola bottle was thrown out of the window above by one of the sailors. The bottle crashed on the pavement beside the plaintiff and a fragment of the broken glass entered the plaintiff's left eye. We may pause to state that the injury to her eye has been relatively serious.
The police were immediately summoned. The lights were still illuminated in the room inhabited by the sailors, and the police officers promptly visited the room, observed its disordered condition and interrogated the sailors except one who was on the bed drifting peacefully with the tides of sleep.
Initially there was a denial that any one of the group had thrown a bottle out of the window. The sailors were apprehended and subsequently one of them supplied the admission *387 that in attempting to throw the bottle from the table into a waste-paper basket beneath the open window, it accidentally passed out the window. The explanatory testimony of the crafty or repentant sailor taken at some proceeding of a criminal nature was incorporated in the transcript of the evidence in the present action.
Inasmuch as the hotel clerk had been previously notified that the sailors were engaged in throwing some object about, the court admitted testimony relating to the condition of the room upon the removal of its occupants. There were broken bottles and broken water glasses on the floor. There were "half moon shaped" indentations on the wall with shattered fragments of glass beneath. A plywood movable closet was broken, chairs were overturned and beds pulled out of position.
It must be immediately recognized that the subject matter of this appeal is confined solely to the consideration of the legal obligations of the defendant hotel company in the circumstances, and more specifically to the determination of whether the evidence adduced by the plaintiff was sufficient to sustain a prima facie cause of action against the hotel company for submission to the jury.
Basically the cause of action must necessarily be erected upon the existence of a duty which the defendant owed to the plaintiff and the failure of the defendant to fulfill that duty to the injury of the plaintiff. Moreover to sustain a recovery there must be some causal connection between the fall of the bottle and the omissions of duty of the proprietor of the hotel, his servants or persons for whose acts he may be held responsible. Obviously there is no proof that the hotel keeper or any servant of his threw the bottle. The case implicates a consideration of the legal relation existing between those who occupy rooms of a hotel as transient guests and the proprietor's responsibility for their acts.
The rights of the proprietor are not unrestricted. When a guest is given the key to his room, it symbolizes the surrender of the quarters to the guest subject only to such visitations at reasonable times as the proprietor or his servants *388 may deem necessary properly to maintain the rooms and to supervise their use so that they may not become obnoxious to the proprieties of behavior, morality and the law of the land. Apart from these privileges accorded the management, the guest is entitled to possess the free and unmolested use and enjoyment of his room or apartment without interference from any one. Indeed, unwarranted and unjustifiable interference by a proprietor or his servant may occasion consequential liabilities.
On the other side, the hotel proprietor has the undoubted right and in some circumstances the duty to evict a disorderly, malevolent and incorrigible guest.
The responsibility of the hotel proprietor for the injurious consequences of the wrongful acts of his guests to outsiders is recognized in that narrow zone between his inhibitions against unwarranted interference and his duty with respect to the management of his premises exemplified by the maxim, sic utere tuo ut alienum non laedas.
The generally accepted view is that an innkeeper is liable to a stranger for personal injury where the innkeeper or his servants knew or by the exercise of reasonable care could have known that the behavior of the guest was such as to indicate to one of average prudence that the guest might commit acts which would naturally result in injury to others. Among the reported decisions on the subject of recent years are Bruner v. Seelbach Hotel Co., 133 Ky. 41, 117 S.W. 373 (Ky. Ct. of App. 1909); Gore v. Whitmore Hotel Co., 229 Mo. App. 910, 83 S.W.2d 114 (Kansas City Ct. of App. 1935); Wolk v. Pittsburgh Hotels Co., 284 Pa. 545, 131 A. 537 (Sup. Ct. 1925); Kapphahn v. Martin Hotel Co., 230 Iowa 739, 298 N.W. 901 (Sup. Ct. 1941); Larson v. St. Francis Hotel, 83 Cal. App.2d 210, 188 P.2d 513 (Dist. Ct. of App. 1948); Agsten v. Lemma, 119 W. Va. 330, 193 S.E. 545 (Sup. Ct. of App. 1937). See, also, 32 C.J. 562, sec. 69; 14 R.C.L. 538, sec. 36; 28 Am. Jur. 636, sec. 138.
Contemplating therefore the nature of the legal duty that descended upon the defendant, we next encounter the questions *389 whether in the circumstances divulged by the evidence the defendant by the course of conduct of its representative was shown in at least a prima facie degree to have been negligent in the observance and fulfillment of its duty, and if so, was the dereliction in that particular made to appear by a similar degree of proof to have been a natural and proximate cause of the injury eventually sustained by the plaintiff.
In approaching the determination of those questions we are cognizant of the applicable general principles. The law makes no unreasonable demands. It does not require from any one superhuman wisdom, perspicacity, foresight and vigilance. It does not convert the innkeeper into a constant watchman and guardian of the conduct of his guests. The dictates of reasonable care do not impose unreasonable burdens.
In the pertinent decision rendered in Bruner v. Seelbach Hotel Co., supra, the Court of Appeals of Kentucky remarked "Besides, the fact must be remembered that ordinarily innkeepers have no control over their guests. It is only when they know, or by the exercise of ordinary care could know, that the guest's conduct is such that injury will naturally result to others, that they have the right to eject the guest, or take precautions to control his conduct."
The following quotation is taken from the well considered opinion of the Supreme Court of Pennsylvania in Wolk v. Pittsburgh Hotels Co., supra: "Undoubtedly the proprietor could no more be held responsible for the consequences of his guests' willful acts in throwing articles to the street unless he could prevent it, than he would be for the wrongful act of his servants outside the scope of employment. Nor would he be liable for the result of articles placed on the window sill falling to the street, unless he knew or had reason to know the thing placed there was of a dangerous nature, or likely to fall to the street."
We recently remarked in Gentile v. Pub. Service Coordinated Transport, 12 N.J. Super. 45 (App. Div. 1951), that: "Negligence in the abstract is a nihility. Both negligence *390 and reasonable care are relative terms. They derive their animation in the law of torts only when they are in articulation with a given body of factual conditions and circumstances." The present case conspicuously exemplifies the significance of that statement. In the light of the knowledge which had been imparted to the hotel clerk and of the information which in the exercise of reasonable vigilance and circumspection he could have acquired, was he remiss in his duty or was his conduct all that would naturally be expected of an ordinarily cautious and prudent person in his position under like or similar circumstances?
If in the deliberate and impartial consideration of that issue fair-minded men or women might honestly differ as to the conclusions to be logically drawn from the circumstances, then the issue should have been submitted to the jury for determination. Scarano v. Lindale, 121 N.J.L. 549 (E. & A. 1938); Schwartz v. Rothman, 1 N.J. 206 (1948); Fischetto Paper Mill Supply, Inc., v. Quigley Co., Inc., 3 N.J. 149 (1949); Antonio v. Edwards, 5 N.J. 48 (1950); Vadurro v. Yellow Cab Co. of Camden, 6 N.J. 102 (1950).
A motion for the involuntary dismissal of an action pursuant to Rule 3:41-2 under our present practice is comparable to a motion for an involuntary non-suit under our former practice. Morsey v. Erle, 4 N.J. 276 (1950). We are therefore to assume that the learned trial judge rationalized that notwithstanding the acceptance as true of all of the evidence on behalf of the plaintiff and of every favorable inference of fact that could be legitimately drawn therefrom, fair-minded jurors could not by the processes of logical deductions conclude that the defendant was guilty of any negligence which proximately contributed to the plaintiff's injury, and the judge accordingly pursued the course which the law imposes in such a state of the evidence. Kaufman v. Pennsylvania Railroad Co., 2 N.J. 318 (1949).
In these matters the fair-minded man is no less a theoretical personification than the ordinarily prudent man. To determine whether the fair-minded man could from the *391 evidence conclude within the precincts of rationality the existence of a state of facts which in the law establishes a prima facie cause of action is appropriately the prerogative of the judge; to decide whether amid those existing facts, if deemed actionable, the defendant acted or failed to act in conformity with the standard conduct of the ordinarily prudent person is appropriately to be presented to the forum of common knowledge and experience in which the jury functions.
Therefore in the consideration of the ruling under review we have endeavored to envision the entire field of the mental reactions which we conceive that a fair and logically minded person might experience in the cogitation of the factual circumstances of the present case.
We apprehend that the fair-minded person might entertain the following convictions: that the hotel clerk knew that there had been admitted to the hotel a group of sailors, off ship and apparently on temporary leave; that he learned from his first message from them that one or more had a propensity to indulge in intoxicating liquor and desired a bottle of rum; that he later learned that they had become boisterous to a degree annoying to a guest in other quarters; that he evidently regarded the complaint to be credible and sufficiently significant to induce him to admonish them; that it is not evident that the sailors denied the truth of the complaint but promised to cease; that about 20 minutes later he learned that the sailors had willfully disregarded his previous request and that they were engaged in "throwing" some object or objects about the room (we ascribe considerable significance to the information that the sailors were "throwing" objects because that is the type of mischief which ultimately caused the plaintiff injury); that the hotel clerk was then aware that the sailors were unusual guests in that they were uncommonly boisterous, inordinately mischievous, if not quarrelsome, and certainly disobedient; that in this instance he visited the entrance to the room, conversed with one of the sailors, again giving warning against a further *392 continuance of their misconduct; that the clerk did not enter the rooms to ascertain what objects they had been throwing and, notwithstanding his knowledge that the sailors had previously ignored his warning from which he might have anticipated the liklihood that they would do so again, he returned to the office, out of the range of hearing them and gave the matter no further attention because of the absence of a third complaint.
Additionally, perhaps, the fair-minded person might have inferred that the obstreperous "throwing" of bottles and drinking glasses continued spasmodically after the clerk's visit in proportion to the increase of their consumption of liquor; that such should have been reasonably anticipated and that in view of the knowledge of the extraordinary behavior of these guests a reasonably prudent and cautious clerk would have followed up his supervisory endeavors and kept those particular guests under some measure of surveillance, in which case the mishap would not have occurred.
Manifestly the pivotal point relates to the character of the conduct of the clerk following his visit to the rooms.
Reasonable anticipation, spoken of in the law of negligence as foresight for harm, is that expectation generated in the mind of the person of ordinary vigilance and circumspection in consequence of his reaction to a set of circumstances. The element of "foresight for harm" seems to be regarded as a factor of cogent significance in cases of this particular nature. Appreciating the knowledge of the clerk that the window was open and that a public street was beneath it, and his reason to believe that the sailors were in a devil-may-care mood and throwing objects in the room, we are unable to agree that his situation was so clearly beyond the range of the reasonable apprehension of injury to someone as to be excluded from the consideration of the jury and treated as a matter of law rather than as a factual problem. Moreover, in the present case we apprehend that the factual circumstances in material respects were not entirely free from divergent inferences. Illustratory are the following: did all *393 of the disorderly conduct of the guests precede in point of time the clerk's visit and thereupon cease, or did it thereafter persist? Did the sailors heed the clerk's last warning, desist from their offensive behavior, and was it in truth in the endeavor of the sailor to toss the bottle into the waste basket that it passed out of the window, hence an intervening act distinctly independent of and disassociated with the exhibitions of previous malfeasance? Unfortunately the complaining guest did not appear at the trial and impart her information concerning a continuance, if any, of the misbehavior.
Upon mature reflection we are constrained to conclude that this alleged cause of action in the existing state of the evidence and in recognition of the principles of law applicable to the measure of responsibility of the innkeeper ought to have been submitted to the jury. To warrant an involuntary dismissal it is not enough that the facts are without contradiction; the inference that is drawn from such facts must likewise be, in a legal sense, indubious, i.e., one about which reasonable men might not honestly differ. Furniture Co. v. Board of Education, 58 N.J.L. 646 (E. & A. 1896).
Judgment reversed and a new trial directed. Costs to abide the event.